***********
This matter was heard before Deputy Commissioner Hall on 29-31 May 2002 and on 20 June 2002. The Full Commission, based upon the record of the proceedings before Deputy Commissioner Hall, and the briefs and oral arguments on appeal, reviewed this matter. The appealing party has shown good ground to amend the holding of the prior Opinion and Award. Accordingly, the Full Commission REVERSES the holding of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as facts, and concludes of matters of law, the following, which were entered into by the parties at and subsequent to the hearing before the Deputy Commissioner on 15 December 1999 as:
 STIPULATIONS
1. Plaintiff was employed by Defendant/Employer, Yeargin Construction/Harbert Yeargin/Rust Constructors (designated hereafter as "Harbert Yeargin") from 1975 through March 30, 1997 excluding one day in 1982 when Plaintiff worked for BEK Construction Company, approximately two months in 1983 when Plaintiff worked for Daniel International, approximately three months in 1984 and almost all of 1985 when Plaintiff worked for Dixie Constructors, approximately two weeks in 1987 and a few months in 1988 when Plaintiff worked for Davis Electrical Constructors, all as confirmed by the Social Security Administration Itemized Statement of Earnings stipulated into evidence.
2. Plaintiff was employed by Defendant/Employer, Becon Construction Company, from March 31, 1997 through August 8 or 11, 1997.
3. The parties are subject to the North Carolina Workers' Compensation Act since both Defendant/Employers employed the requisite number of employees to be bound under the provisions of the Act.
4. Defendant/Employer, Harbert Yeargin, was insured by Liberty Mutual Insurance Company from 1975 through March 31, 1997 when Plaintiff ceased working for Harbert Yeargin and began working for Becon Construction Company.
5. Defendant/Employer, Becon Construction Company, was insured by Reliance National Insurance Company from March 31, 1997 through December 13, 1998 with ESIS serving as servicing agent.
6. Plaintiff legally adopted his 11-year-old grandson, James Michael Wallace, pursuant to court decree dated March 4, 1999.
7. It is stipulated that Plaintiff contends that should Plaintiff/Employee die allegedly as a result of his occupational disease(s), Plaintiff/Employee shall be allowed to conduct a hearing to address whether Mr. Wallace's wife, Virginia Wallace, is disabled as of the time of Mr. Wallace's death and whether the legally adopted grandson, James Michael Wallace, is a dependent, such that they may receive benefits in addition to death benefits allowed under the Act.
8. Stipulated Exhibits 1-4 were received into evidence.
9. Subsequent to the hearing in this matter, the parties stipulated that "Dr. Said Eslami, a certified radiologist, is competent to testify as an expert radiologist and medical physician and would testify that he reviewed a chest film (x-ray) of James L. Wallace dated July 3, 1997, and did not see any radiographic evidence consistent with asbestosis. The parties further stipulate that Dr. Eslami did not see any radiographic evidence of interstitial changes consistent with asbestosis nor see any pleural plaques."
 ***********
Based upon the evidence of record, the Full Commission enters the following;
 FINDINGS OF FACTS
1. Plaintiff was 55 years old at the time of the hearing before the Deputy Commissioner and had a sixth grade education. Plaintiff has worked all his life in the construction and maintenance field as a pipe fitter and welder. Plaintiff smoked cigarettes until he quit approximately 12 years ago.
2. Plaintiff has not worked since on or about August 11, 1997 due to his lung cancer and other conditions. Plaintiff remains at home under the daily care of his wife, Virginia Wallace and his daughter, Tammy Cooprider.
3. Plaintiff began working for construction companies in the early 1960s. He learned to be a pipe fitter and welder while working for several different construction companies. Early in his career he was exposed to asbestos when he used fire blankets made of asbestos while welding. These blankets deteriorated over time and released airborne asbestos.
4. Plaintiff worked at the Hoechst Celanese plant in Earl, North Carolina from 1971 through 1975 as an employee of Daniel Construction. Plaintiff mostly worked in "shutdowns." A shutdown occurred when workers would tear down and refurbish/rearrange an existing work area of the plant's pipes, equipment, insulation, wires, sheet metal, etc. . . . Areas of the plant were always having to be shutdown and rebuilt as Celanese produced new products.
5. During these shutdowns the plaintiff was exposed to airborne asbestos as those around him tore out and installed asbestos-containing insulation products and dropped the material on him and beside him. The air was dusty with this asbestos-containing material in plaintiff's immediate work area for long periods of time. Plaintiff observed the word "asbestos" on the boxes of insulation material he saw being installed around him.
6. Beginning in 1986 and continuing until March of 1997, the plaintiff worked for Yeargin Construction. Plaintiff worked as a pipe fitter/welder and then as a foreman at the Earl Celanese facility. Plaintiff continued to be exposed daily to asbestos during shutdowns and in doing general maintenance.
7. On 31 March 1997 the Yeargin organization lost the plant maintenance contract to the Becon Construction Company. Plaintiff thereafter worked for Becon Construction Company performing exactly the same job he had been doing for the Yeargin organization. Every aspect of the plaintiff's job and asbestos exposure remained identical while working for Becon. The plaintiff was exposed to asbestos for more than 30 days while working for Becon.
8. In July of 1997 the plaintiff began coughing up blood and was referred to a pulmonologist, Dr. Applebaum. A bronchoscopy was performed and the biopsy revealed lung cancer. 11 August 1997 was the plaintiff's last day of work. On 12 August 1997 the plaintiff underwent a right thoracotomy and right pneumonectomy that were performed by Dr. Steven Leyland. On 12 August 1997 Dr. Charles Webb, a pathologist, examined the plaintiff's lung tissue and diagnosed large cell carcinoma of the lung with the presence of asbestos bodies.
9. The plaintiff was unable to work and stayed at home after the surgery. His wife and daughter provided daily care to plaintiff, and he remained cancer-free until January 1999, when he again began coughing up blood. A cytology and pathology report dated 15 January 1999 indicated large-cell cancer in his trachea. From January through June of 1999 the plaintiff underwent 28 radiation treatments with Dr. Drew Monitor and numerous chemotherapy treatments with Dr. Eric Nelson. Plaintiff continued to be unable to work. His wife and daughter cared for him at his home.
10. In October of 1999 the plaintiff began suffering from very painful shingles, or herpes zoster. Drs. Applebaum and Nelson attribute this condition to the plaintiff's weakened immune state due to the cancer combined with the radiation and chemotherapy treatments.
11. Due to the scarring and constriction of the plaintiff's trachea, beginning in September 2000, it has been necessary to stent the plaintiff's trachea in order to allow the plaintiff to breathe. Plaintiff has since undergone 14 bronchoscopic surgical procedures to check, unclog, adjust, and replace the plaintiff's stent. Due to this condition the plaintiff cannot be left alone for fear his stent may become clogged and make his breathing impossible. The plaintiff's wife and daughter continue to provide attendant care.
12. Dr. Mary Applebaum is a board-certified pulmonologist. Plaintiff was referred to Dr. Applebaum by his family physician in July of 1997. In her deposition Dr. Applebaum testified that due to plaintiff's job the plaintiff was at a greater risk than the general public to contract lung cancer. Dr. Applebaum also testified that the plaintiff's job-related exposure to asbestos was a significant contributing factor in his contracting lung cancer.
13. Dr. Applebaum referred the plaintiff to Dr. Leyland. On 12 August 1997 Dr. Leyland performed a right thoractomy, right middle and lower lobectomy with frozen section and a right pneumonectomy. During the surgery Dr. Leyland observed bilateral pleural plaques consistent with previous asbestos exposure.
14. Dr. Webb, the hospital pathologist, examined plaintiff's lung tissue subsequent to the surgery. Dr. Webb testified that he observed carcinoma and asbestos bodies within plaintiff's lungs.
15. Plaintiff's lung tissue was thereafter sent to Dr. Rigler. Dr. Rigler has a Ph.D. in microbiology and is vice president of a materials testing laboratory. Dr. Rigler testified that he observed 12 asbestos bodies on a single slide. Dr. Rigler defined an asbestos "body" as an asbestos fiber with iron or protein encrusted around it. Dr. Rigler noted that he had never seen a slide with that many bodies in his over 10 years of experience observing lung tissue. Dr. Rigler also noted that the asbestos bodies in the plaintiff's lung tissue were unusually large and that the asbestos found was "amosite" asbestos. Amosite asbestos was by far the most commonly-used commercial asbestos used in the United States.
16. Subsequently, Dr. Steven Dikman reviewed the plaintiff's medical records and pathology materials. Dr. Dikman is a pathologist and Professor of Pathology at the Mt. Sinai School of Medicine in New York City. Dr. Dikman confirmed the diagnoses and observations of Dr. Webb. Dr. Dikman also testified that the plaintiff's lung cancer was caused by asbestos exposure and that the pathological evidence established asbestos as a causation factor in the cancer.
17. Dr. Arthur Frank also reviewed the plaintiff's medical file and pathological evidence. Dr. Frank is a board-certified physician and Ph.D. in biomedical sciences who practices and teaches occupational medicine at The Drexel University of Public Health. Dr. Frank practices occupational medicine with an emphasis on asbestos-related diseases. Dr. Frank has published over 30 articles and over 30 book chapters on asbestos. Dr. Frank's work and study has a particular focus on asbestos-related diseases. After reviewing plaintiff's materials, Dr. Frank testified that the plaintiff had lung cancer that was significantly contributed to by his occupational exposure to asbestos.
18. Dr. Craighead testified that the plaintiff's lung cancer was not related to the asbestos exposure. Dr. Craighead's opinion seems to be based in large part on a chest x-ray of plaintiff taken before the lung removal and biopsy. Furthermore, Dr. Craighead testified that plaintiff's long-term significant exposure to airborne asbestos in the work environment did not put the plaintiff at a greater risk to develop lung cancer than a member of the general public not so employed.
19. The undersigned give less weight to the opinions of Dr. Craighead than those of the other doctors.
20. Dr. Nelson is the plaintiff's current treating cancer doctor. Dr. Nelson was deposed and completed an errata sheet subsequent to the deposition on which he clarified his testimony and indicated that in his opinion the plaintiff's lung cancer was caused or significantly contributed to by his exposure to asbestosis. The Commission ordered Dr. Nelson to be deposed a second time regarding his errata sheet comments. At that deposition Dr. Nelson testified that he agreed with Drs. Applebaum, Frank, and Dikman regarding the cause of plaintiff's cancer. Furthermore, he testified that his errata sheet changes following the first deposition were made freely and using his own word choices.
21. The plaintiff's herpes zoster condition is related to his cancer and cancer treatment.
22. Given the multiple very serious conditions suffered by plaintiff due to his lung cancer, the undersigned find that the plaintiff required attendant care for eight hours per day, seven days a week beginning 11 August 1997 and continuing.
23. In the last full calendar year of his employment, the plaintiff earned $34,552.35, which yields an average weekly wage of $664.47.
 ***********
Based upon the foregoing findings of fact, Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff's acquisition of asbestos-linked lung cancer was due to causes and conditions characteristic of and peculiar to his employment. Asbestos-linked lung cancer is not an ordinary disease of life to which the general public not so employed is equally exposed, and is, therefore, a compensable occupational disease. N.C. Gen. Stat. § 97-53(13).
2. At the time of the plaintiff's last exposure to the conditions that significantly contributed to his development of his compensable occupational disease, the plaintiff was employed by Becon Construction Company, which, in turn, was insured by Reliance National Insurance Company. Reliance National Insurance Company is the carrier on the risk.
3. In the last full calendar year of his employment, the plaintiff earned $34,552.35, which yields an average weekly wage of $664.47 and a weekly compensation rate of $443.00. Given the circumstances of this case and the records available, the $664.47 figure is the most fair and accurate weekly wage to use for the purposes of this decision. N.C. Gen. Stat. § 97-2(5).
4. As a result of his contraction of the compensable occupational disease, plaintiff is entitled to ongoing temporary total disability compensation at the rate of $443.00 per week from 11 August 1997 and continuing until the plaintiff returns to work or further order of the Commission. N.C. Gen. Stat. § 97-29.
5. As a result of his contraction of the compensable occupational disease, the plaintiff is entitled to the payment by defendant of all medical expenses incurred as a result. N.C. Gen. Stat. § 97-25.
6. The care provided by the plaintiff's wife and daughter is reasonable and has significantly contributed to the improvement and recovery of the plaintiff in this matter. Accordingly, Ms. Barnwell is entitled to be paid or reimbursed for 8 hours per day, 7 days per week attendant care services beginning 11 August 1997 and continuing until further order of the Commission. N.C. Gen. Stat. § 97-25. The parties shall stipulate to the local market price for the level of attendant care required by plaintiff.
 ***********
Based upon the foregoing findings of facts and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner, with modifications, and enters the following:
 AWARD
1. For his compensable contraction of an occupational disease, defendant Reliance National Insurance Company shall pay temporary total disability compensation at the rate of $443.00 from 11 August 1997 and continuing until the plaintiff returns to work or further order of the Commission.
2. Defendant Reliance Insurance Company shall pay all medical expenses incurred by plaintiff as a result of his compensable contraction of an occupational disease.
3. Defendant Reliance Insurance Company shall pay plaintiff's wife, Mrs. Wallace for 8 hours per day, 7 days per week of attendant care services beginning 11 August 1997 and continuing until further order of the Commission.
4. A reasonable attorney's fee of twenty-five percent of the compensation due plaintiff under Paragraph 1 of this AWARD is approved for plaintiff's counsel, and shall be paid as follows: twenty-five percent of the lump sum due plaintiff shall be deducted from that sum and paid directly to plaintiff's counsel. Thereafter, every fourth check shall be sent directly to plaintiff's counsel.
5. Defendant Reliance Insurance Company shall pay the costs.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/_____________ PAMELA T. YOUNG COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER